Caban v Nagy (2024 NY Slip Op 51446(U))

[*1]

Caban v Nagy

2024 NY Slip Op 51446(U)

Decided on October 24, 2024

Supreme Court, Kings County

Mallafre Melendez, J.

Published by New York State Law Reporting Bureau pursuant to Judiciary Law § 431.

This opinion is uncorrected and will not be published in the printed Official Reports.

Decided on October 24, 2024
Supreme Court, Kings County

Johnny Caban, Plaintiff,

against
Fanny Ita Nagy, M.D., Defendants.

Index No. 521287/2020

Plaintiff
Andrew J. Barovick, Esq. (abarovick@silverkelmachter.com)
Andrew J. Barovick, P.C.
38 Chester Place
New Rochelle, NY 10801
914-844-8676
Defendant
Rani Kulkarni, Esq. (r.kulkarni@bpn.law)
Barker Patterson Nichols, LLP
420 Lexington Avenue
New York, NY 10170
516-282-3355, ext. 163

Consuelo Mallafre Melendez, J.

Recitation, as required by CPLR §2219 [a], of the papers considered in the review:
NYSCEF #s: 55 — 56, 57 — 63, 66 — 69, 70 — 71
Defendant Fanny Ita Nagy, M.D. ("Dr. Nagy") moves (Seq. No. 4) for an Order, pursuant to [*2]CPLR 3212, granting summary judgment and dismissing all claims and causes of action against said defendant with prejudice. Plaintiff opposes this motion.
Plaintiff commenced this action on October 30, 2020, alleging claims of medical malpractice and negligence against Dr. Nagy in connection to treatment with Dr. Nagy from January 1, 2016, to January 31, 2019. Plaintiff claims that defendant deviated from the good and accepted standards of medical care by discontinuing seizure medication on April 10, 2018. Plaintiff also makes claims for lack of informed consent.
Prior to his treatment with Dr. Nagy, Plaintiff was diagnosed with epilepsy in approximately 1978 or 1979, Hepatitis C in approximately 1974-1984, and HIV in approximately 1984. Plaintiff was initially prescribed Dilantin and was subsequently switched to Keppra in 2014 to begin treatment for Hepatitis C. Plaintiff testified that he was having seizures every few months until he was prescribed Keppra, and while taking the medication, he had not experienced any seizures. Prior to 2014, the medical records indicate that Plaintiff had approximately one seizure per year, which were associated with heavy drinking.
On February 9, 2016, Dr. Nagy first evaluated Plaintiff for HIV follow-up and his ongoing conditions of seizure disorder, GERD, COPD, hypertension, hyperlipidemia, insomnia, and Hepatitis C. Dr. Nagy refilled the Keppra medication on April 19, 2016, and July 12, 2016. At that time, Plaintiff was taking Xanax, Atripla, Prilosex, Vasotec, Keppra (500 mg two times per day), and Pravastatin for high cholesterol.
Dr. Nagy saw Plaintiff on November 30, 2017, and January 9, 2018, and each time indicated that he was still on 500 mg of Keppra twice per day and his seizures were well-controlled. Dr. Nagy testified that she did not change the dosage of Keppra between February 9, 2016, and April 10, 2018.
On April 10, 2018, Dr. Nagy, after seeing Plaintiff, recorded:
"Patient fell on 3/24 after drinking too much . . . Patient wants to stop some of his medications to simplify his daily routine. He is telling me that he is only taking Keppra once a day in the AM for the past year, instead of twice a day. Last time he had a seizure was 4 years ago. He thinks the seizures were from drinking. He used to drink every day. As per last neurology note found in [electronic records] it is also stated that patient only had seizures associated with drinking. As per patient, he is not drinking constantly and last time, it was an uncommon event" (Exhibit D, at 51).
On the same visit, Dr. Nagy discontinued Plaintiff's Keppra medication. She recorded that she discontinued the medication because Plaintiff wanted to simplify his daily medication intake and he had already reduced his Keppra dosage to 500 mg per day rather than every 12 hours without issue.
On May 1, 2018, and August 2, 2018, Plaintiff returned to Dr. Nagy's office and reported no seizures.
On January 31, 2019, Plaintiff was admitted to Staten Island University Hospital (SIUH) after having a grand mal seizure, during which he sustained second degree burns on both hands and his right shoulder from falling on a radiator. The SIUH records note that while Plaintiff was in the hospital, he suffered two additional seizures and was re-prescribed Keppra. Plaintiff denied any consumption of alcohol prior to the seizure on January 31, 2019.
On February 26, 2019, Plaintiff returned to Dr. Nagy for the final visit. Plaintiff testified that he has not had a seizure since his hospitalization in January 2019.
Plaintiff alleges that Dr. Nagy departed from the standard of care in allowing plaintiff to stop taking Keppra, an anti-seizure medication, misdiagnosing the plaintiff as no longer needing anti-seizure medication, failing to appropriately taper the plaintiff off the Keppra medication, failing to refer the plaintiff to a neurologist and other consultations before discontinuing the medication, and failing to obtain informed consent from the plaintiff. The plaintiff alleges that those departures proximately caused the grand mal seizure on January 31, 2019, where the plaintiff received burns on his hands from falling on a radiator.
Generally, "[i]n determining a motion for summary judgment, the court must view the evidence in the light most favorable to the nonmoving party" (Stukas v Streiter, 83 AD3d 18, 22 [2d Dept 2011]). In evaluating a summary judgment motion in a medical malpractice case, the Court applies the burden shifting process as summarized by the Second Department:
"The elements of a medical malpractice cause of action are a deviation or departure from accepted community standards of practice, and that such departure was a proximate cause of the plaintiff's injuries. When moving for summary judgment, a defendant provider has the burden of establishing the absence of any departure from good and accepted medical practice or that the plaintiff was not injured thereby. In order to sustain this burden, the defendant must address and rebut any specific allegations of malpractice set forth in the plaintiff's bill of particulars. In opposition, the plaintiff must demonstrate the existence of a triable issue of fact as to the elements on which the defendant has met his or her initial burden. General allegations of medical malpractice, merely conclusory and unsupported by competent evidence tending to establish the essential elements of medical malpractice, are insufficient to defeat a defendant's summary judgment motion. Although summary judgment is not appropriate in a medical malpractice action where the parties adduce conflicting medical expert opinions, expert opinions that are conclusory, speculative, or unsupported by the record are insufficient to raise triable issues of fact" (Barnaman v Bishop Hucles Episcopal Nursing Home, 213 AD3d 896, 898-899 [2d Dept 2023] [internal quotation marks and citations omitted]).
An expert opinion need not be provided by a specialist, but the expert must demonstrate that they are "possessed of the requisite skill, training, education, knowledge or experience from which it can be assumed that the opinion rendered is reliable" (DiLorenzo v Zaso, 148 AD3d 1111, 1112-1113 [2d Dept 2017]).
In support of this motion, Dr. Nagy submits an expert affirmation from Preston Winters, M.D. ("Dr. Winters"), a physician with board certification in internal medicine. This Court finds that Dr. Winters has established his qualifications as an internist to opine on the applicable standard of care for the issues in this case. The movant also submits medical records and deposition transcripts.
Based on his review of the record, Dr. Winters opines that Dr. Nagy acted within good and accepted standards of medical practice from 2016 to 2019.
First, regarding whether Dr. Nagy departed from the standard of care by taking Plaintiff off Keppra on April 10, 2018, Dr. Winters opines that Dr. Nagy acted within good and accepted standards of medical practice because patients taking anti-seizure medications frequently are taken off of the medications after one or two years if they are seizure-free. Dr. Winters opines that there is no standard of care requiring patients with prior seizures to stay on anti-seizure medications for life. Thus, Dr. Winters opines it was reasonable for Dr. Nagy to discuss the option of discontinuing Keppra, especially after Plaintiff had been taking half of the prescribed dosage for a year without incident. Dr. Winters opines that [*3]500 mg per day was only half of "the minimal therapeutic dose" for the Keppra medication. Further, Dr. Winters opines that there is no evidence of seizures at any time from 2014 to 2018 in the medical records, and Plaintiff's testimony confirms the absence of seizures during that timeframe. 
Dr. Winters also opines that Dr. Nagy did not fail to taper the plaintiff from the Keppra. Again he notes that based on the medical records and Plaintiff's own statements to his doctor, he had ceased taking Keppra twice daily and effectively reduced his own dosage to 500 mg per day, rather than the prescribed 1000 mg per day. Dr. Winters therefore opines that he was already on a "subtherapeutic" dose — below the minimally effective dosage — without any seizure episodes for one year. Under these circumstances, Dr. Winters opines that no additional dosage reduction was required by the standard of care prior to discontinuation of the mediation entirely.
Dr. Winters further opines that the standard of care did not require Dr. Nagy to refer Plaintiff to a neurologist or other specialist, because an internist is qualified to make determinations on prescribing or discontinuing anti-seizure medication.
The expert also notes that "none of the prior notes in any of the medical records identified any type of structural issue with the brain causing the prior seizures," and his MRI and EEG were "negative" for such issues following his January 31, 2019 seizure. Dr. Winters opines that Dr. Nagy accurately documented that his "prior seizures were associated with heavy drinking" and did not misdiagnose his seizures as alcohol related.
On the issue of proximate causation, Dr. Winters opines that Dr. Nagy's alleged departure from the standard of care was not a substantial contributing factor to the seizure on January 13, 2019. Dr. Winters opines that the seizure was more than nine months after the medication was discontinued. Dr. Winters opines that if the seizure was an effect of an abrupt discontinuance of Keppra, the seizure would have occurred relatively soon after the discontinuance rather than nine months later.
Based on the submissions, Dr. Nagy has met her prima facie burden of demonstrating there were no departures from the standard of care with respect to discontinuing Plaintiff's Keppra medication. According to the movant's expert, it was appropriate within the standard of care for an internist to discontinue the medication because Plaintiff was seizure-free for approximately four years, and for the previous year he was taking half the prescribed dose with no issues. Further, the expert opines that the fact he was taking a "subtherapeutic" dose of 500 mg per day made it unnecessary to "taper off" the medication or prescribe a lower dose. Dr. Nagy's expert also established prima facie that the discontinuance of Keppra was not a proximate cause of Plaintiff's subsequent seizure and related injuries, based on the length of time between the April 2018 cessation of medication and his seizure on January 31, 2019. The burden therefore shifts to Plaintiff to raise an issue of fact.
In opposition, Plaintiff submits an expert affirmation from Gail L. Clifford, M.D. ("Dr. Clifford"), a licensed physician. Although Plaintiff's opposition was filed five days after the deadline set by the parties at their last request for an adjournment, the Court accepted these papers pursuant to CPLR 2004, upon application and good cause shown by counsel on October 16, 2024, and without prejudice to the movants who were permitted an extension to file their reply.
Dr. Clifford affirms that he is board-certified in internal medicine, and the Court finds he has sufficiently established his educational background and clinical experience to opine on the treatment at issue. Dr. Clifford opines that Dr. Nagy departed from the standard of care by taking him off the anti-seizure medication Keppra "when it was not clear whether or not he was continuing to benefit from it" and by failing to consult or refer him to a neurologist before making the decision.
The expert notes that Dr. Nagy knew of Plaintiff's history of heavy drinking, and on the April 10, [*4]2018 appointment, he disclosed to her that he had sustained a fall from "drinking too much" as recently as March 24, 2018. The expert opines that in light of this admission, Dr. Nagy should not have taken him off his anti-seizure medication "under any circumstances." Dr. Clifford opines that it is a departure from the standard of care to discontinue anti-seizure medication when a patient has admitted to heavy drinking within the last month, because alcohol consumption is known to "lower the seizure threshold" and put a patient who is prone to seizures at higher risk for recurrence.
Dr. Clifford disputes the movant's expert opinion that most physicians "opt to wait for one or two years" to discontinue anti-seizure medication if a patient is seizure-free, and Plaintiff had been seizure-free for at least two years. In the opinion of Plaintiff's expert, it is the standard of care to wait two to five years, and because Plaintiff was uncertain how often he'd been taking Keppra prior to seeing Dr. Nagy, it was a departure from the standard of care to discontinue the medication.
Dr. Clifford also counters the opinion of Dr. Winters that Plaintiff was on a "subtherapeutic" dose for a year at the time of the April 2018 appointment. Dr. Clifford agrees that 500 mg twice daily (1000 mg per day) is typically the minimum dosage of Keppra, with a maximum dosage of 4000 mg per day. However, the expert points out that his reduced dosage "for the past year" is based only on Dr. Nagy's record of what Plaintiff told her (Exhibit D, at 51). Plaintiff disputed this in his deposition and testified he was still taking it twice a day until April 2018 (Plaintiff deposition tr, at 45). The expert opines that there was no way of knowing without lab testing whether Plaintiff was on an ineffective, "subtherapeutic" dose of Keppra. Additionally, the expert opines that the efficacy of his dosage would have been impacted by the medications he was taking for HIV and Hepatitis C. Therefore, in Dr. Clifford's opinion, it is not definitive whether he was on a "subtherapeutic" dose, and it was a departure from the standard of care to discontinue his medication based on that assumption.
Finally, Dr. Clifford disputes the opinion of Dr. Winters that a neurology consult was not required by the standard of care, stating that "[w]hile not every patient on anti-seizure medication needs to be referred to a neurologist, this patient did because of his comorbid conditions, his history of non-compliance, and because Dr. Nagy was not a specialist in the process." The expert therefore opines that it was a departure from the standard of care not to refer Plaintiff for examination by a neurologist before determining whether it was safe to remove him from the anti-seizure medication.
Dr. Clifford also renders an opinion that Dr. Nagy's alleged departures from the standard of care were a proximate cause of Plaintiff's January 31, 2019 seizure and his resulting injuries. Dr. Clifford counters Dr. Winters' statements that the passage of time (nine months) before the seizure demonstrate that seizure was not caused by an abrupt cessation of Keppra. Plaintiff's expert cites to literature showing that there remains a heightened risk of seizure recurrence at one, two, and three years after discontinuing anti-seizure medication. The expert also opines that the highest risk of seizure is within the first six to twelve months after discontinuing such medication, and therefore disputes the opinion of movant's expert that Plaintiff's seizure would have occurred in a shorter timeframe if it was causally related to the cessation of Keppra.
Plaintiff has raised issues of fact sufficient to defeat a motion for summary judgment. Plaintiff's expert addresses the opinions set forth by the movant's expert and offers conflicting opinions on the standard of care and Dr. Nagy's alleged deviations from that standard. These conflicting opinions include whether it was appropriate to take Plaintiff off Keppra in light of his seizure-free period, admitted alcohol use, statements about his non-compliance with the prescribed dosage, and without examination by a neurologist. Plaintiff's expert also offers a counter-opinion on whether the cessation of Keppra in April 2018 was a substantial factor in causing or contributing to his injuries from the subsequent grand mal seizure on January 31, 2019. "When experts offer conflicting opinions, a credibility question is presented [*5]requiring a jury's resolution" (Stewart v North Shore University Hospital at Syosset, 204 AD3d 858, 860 [2d Dept. 2022], citing Russell v Garafalo, 189 AD3d 1100, 1102, [2d Dept. 2020]). Plaintiff has therefore raised issues of fact on the standard of care and proximate causation which preclude summary judgment.
On the issue of informed consent, the movants have established prima facie that this claim is not applicable to the facts underlying this case. "A cause of action alleging lack of informed consent requires an affirmative violation of physical integrity in the absence of informed consent" (S.W. v. Catskill Regional Med. Ctr., 211 AD3d 890, 891 [2d Dept. 2022] [emphasis added]). It is well established that this cause of action does not apply to alleged injuries arising from a failure to administer treatment or perform a procedure, or where "no unconsented-to affirmative violation of the plaintiff's physical integrity is alleged" (Samer v Desai, 179 AD3d 860, 864 [2d Dept 2020]; see also Bueno v Allam, 170 AD3d 939, 942 [2d Dept 2019]; Ellis v Eng, 70 AD3d 887 [2d Dept 2010]; Lyons v Vassar Bros. Hosp., 30 AD3d 477 [2d Dept 2006]). The discontinuance of a medication does not meet this proactive element of a lack of informed consent clam.
Notwithstanding, Plaintiff argues in opposition that their informed consent claim arises from a failure to explain the risks and alternatives of withdrawing the anti-seizure medication, i.e., the risk of seizures. Plaintiff's expert compares the discontinuance of the medication to removing a patient from a ventilator. However, this comparison is not in line with the facts in this case or applicable law. While there is generally "consent" required — typically from a health proxy — to discontinue life-sustaining measures such as ventilator support (see Public Health Law art. 29-CC), this area of law cannot be conflated with the informed consent cause of action outlined in Public Health Law § 2805-d, which expressly involves the risks, benefits, and alternatives of affirmative treatment. Here, Plaintiff's claims arise from allegations of inadequate treatment or cessation of treatment for his condition, not an affirmative treatment, procedure, surgery, or diagnostic test involving invasion or disruption of bodily integrity within the meaning of Public Health Law § 2805-d. Accordingly, the motion is granted to the extent of dismissing the cause of action for lack of informed consent only.
It is hereby:
ORDERED that Dr. Nagy's motion (Seq. No. 4) for an Order, pursuant to CPLR 3212, granting summary judgment and dismissing all claims and causes of action against said defendant with prejudice, is GRANTED TO THE EXTENT of dismissing the cause of action for lack of informed consent, only, and the motion is otherwise DENIED.
This constitutes the decision and order of this Court.
ENTER.
Hon. Consuelo Mallafre Melendez
J.S.C.